SLIP OPINION

Cite as 2016 Ark. App. 318

# ARKANSAS COURT OF APPEALS

DIVISIONS I & II
**No.** CV-15-1008

|  |  |
|---|---|
| | **Opinion Delivered** June 8, 2016 |
| RAY ELLIS<br><br>APPELLANT<br><br>V.<br><br>ARKANSAS DEPARTMENT OF HUMAN SERVICES AND C.E., MINOR CHILD<br>APPELLEES | APPEAL FROM THE CRAIGHEAD COUNTY CIRCUIT COURT, WESTERN DISTRICT<br>[NO. JV-14-19]<br><br>HONORABLE RALPH WILSON, JR., JUDGE<br><br>AFFIRMED |

## LARRY D. VAUGHT, Judge

Ray Ellis is appealing the Craighead County Circuit Court's order denying his motion for placement of his minor child, C.E., in the custody of his brother and changing the case goal from reunification to adoption with termination of parental rights. We affirm.

### I. *Facts and Procedural History*

Ray lived with his wife, KayAnn Ellis, and her two children from a previous relationship, K.T.1 (born January 16, 2008) and K.T.2 (born February 14, 2012). On January 14, 2014, the Department of Human Services (DHS) exercised an emergency hold on K.T.1 and K.T.2[1] for truancy, neglect, and allegations that Ray had physically abused KayAnn.[2] K.T.1 and K.T.2 were subsequently adjudicated dependent-neglected.

---

[1] K.T.1 and K.T.2 were also subjects of this case, but this appeal deals solely with C.E.

[2] On the day that officers appeared at her home and ultimately took K.T.1 and K.T.2 into custody, KayAnn told officers that Ray had beaten her and showed them bruises that she claimed were the result of his physical abuse.

SLIP OPINION

KayAnn gave birth to C.E. on August 18, 2014, and he was immediately placed in DHS custody because his half-siblings had been adjudicated dependent-neglected. C.E. was then adjudicated dependent-neglected based on findings that KayAnn had tested positive for drugs at the time of his birth, his siblings were currently in DHS custody, and KayAnn had alleged that Ray had physically abused her. At the adjudication hearing, the court ordered Ray to complete parenting classes and a drug-and-alcohol assessment, maintain safe and stable housing, maintain stable employment, submit to a psychological evaluation, and attend domestic-abuse counseling, among other requirements of the case plan. DHS was ordered to make referrals for domestic-abuse counseling and conduct a home study on Ray's brother, Josh Ellis. The court entered an order expediting the home study under the Interstate Compact on the Placement of Children (ICPC) because Josh and his wife were both serving in the United States Army in Germany.

On December 12, 2014, the court entered a review order in which it found that KayAnn had tested positive for illegal drugs and was still living with Ray. The court also found that Ray had partially complied with the case plan by beginning parenting classes and attending a drug-and-alcohol assessment but that he had not completed parenting classes or attended any visits with C.E. since mid-November. Ray stated that his work as a truck driver prevented him from attending visits or parenting classes. He had not yet submitted to a psychological assessment or attended domestic-violence counseling. Ray was ordered to pay $45 per week in child support.

In July 2015, C.E.'s foster parents filed a motion for leave to intervene in the case, arguing that C.E. had been in their care for approximately a year and that they wished to adopt

2

him. They stated that the dependency-neglect case was their only forum for filing a petition for adoption. Attached to the motion to intervene was the foster parents' petition to adopt C.E.

On August 3, 2015, Ray filed a motion asking the court to consider the home study that had been completed on his brother, Josh Ellis, and Josh's wife, Tamara Ellis. Ray also filed an answer opposing the foster parents' motion to intervene, and later, a motion to dismiss their petition to adopt C.E. DHS also opposed the foster parents' motion and petition.

On August 28, 2015, the court held a permanency-planning hearing for C.E., at which it also addressed the foster parents' motion to intervene and Ray's motion requesting that C.E. be placed with Josh.[3] Ray, KayAnn, and DHS opposed the motion to intervene, while the attorney ad litem argued in favor of intervention. The court denied the motion to intervene as premature, stating that it would readdress the issue if the case goal later became adoption.

At the hearing, KayAnn testified that she had not gone to therapy as ordered and had not attended NA/AA meetings. She denied using illegal and prescription drugs for which she had tested positive. She denied that Ray was abusive to her. When asked if she had previously told DHS staff that Ray abused her, she testified that she had "said a lot of things" that were untrue due to pressure from DHS. KayAnn stated that she was in favor of C.E. being placed with Josh. KayAnn denied DHS reports that she was combative and out of control at visitation, requiring DHS to change her visitation schedule to allow for more supervision. Regarding a picture of KayAnn with a black eye, which she had reported to DHS as being a

---

[3] The hearing was also a review hearing for K.T.1 and K.T.2. For the purposes of this opinion, we will discuss only the evidence relevant to C.E.

result of Ray's abuse, she testified that the attorney for DHS had instructed her to come to the department with a black eye and falsely accuse Ray of abuse. She stated that she hit herself in the face with a bottle and used makeup to create the black eye that she then blamed on Ray. KayAnn repeatedly denied making numerous other accusations of abuse against Ray. However, she admitted posting on social media an expletive-filled rant against the father of one of her other children in which she threatened that Ray would do physical violence against him.

Patricia Herring, a DHS family services worker, testified that Ray often missed therapy sessions due to his work schedule. Herring also testified that KayAnn had come to a DHS staffing with a bruise on her face and accused Ray of hitting her. She stated that Ray had always denied physically abusing KayAnn.

Herring testified that C.E. required some special services, including physical therapy. She stated that DHS's recommendation for C.E. was that he be placed with Josh in Germany, either through permanent custody or adoption. She stated that, other than completing therapy, Ray was cooperating with DHS and complying with the case plan. She explained that the reason DHS was not recommending that C.E. be returned to Ray's custody was that he lived with KayAnn, and his job as a truck driver would mean that day-to-day care of C.E. would fall to KayAnn. Herring testified that DHS believed it was in C.E.'s best interest to place him within the family and that she did not believe placing him with Ray's brother in Germany would diminish his relationship with his siblings, KayAnn's older children, who were also in foster care in Arkansas. Herring stated that she believed Josh would facilitate continued visitation with C.E.'s siblings despite the fact that Josh lived in Germany. When pressed as to

why DHS prioritized C.E.'s relationship with an uncle he had never met over his relationship with the siblings he currently visited every week, Herring stated that DHS's preference for placement with Josh was due in part to the animosity that had developed between C.E.'s foster parents and his biological parents.

DHS program assistant Billie Williams testified that on or about March 23, 2015, KayAnn told her that Ray had stolen her prescription medication, they had argued over it, and he had hit her. KayAnn also told her that Ray had an outstanding warrant for hot checks and that he had admitted using crystal meth. Williams testified that on multiple occasions KayAnn was unable to be drug tested because she failed to give a urine sample, dropped the sample in the toilet, or provided an adulterated sample. Williams stated that during visitation with KayAnn and Ray, C.E. was content but would never laugh like he did with the foster parents. There were visits when DHS workers had to step in because KayAnn appeared to be under the influence of drugs.

Williams testified that C.E. saw his siblings for at least one visitation per week and that there was a bond between C.E. and his siblings. She said that the children played together during weekly visitation and that the older children often asked about C.E. Williams testified that in the previous year, Ray had attended only nine visits, despite the fact that he had the opportunity to visit C.E. twice per week. Williams also testified that KayAnn had appeared with a "significant injury" to her face and had stated that Ray had struck her in the head. KayAnn told Williams that she was going to file a police report against Ray. Williams stated that, during a staffing, KayAnn and Ray (who was not physically present at the staffing but

appeared via telephone) had argued intensely and that she had worried about what would have happened had he been present, given the intensity of his anger.

Williams testified that C.E. was an extremely happy baby in his foster home and was "overly filled with excitement and love." She stated that he reached for his foster mom and foster dad and constantly crawled to wherever they were. She stated that he "definitely has a very strong bond with the foster parents." She stated that all his needs were being met in the foster home, "and above and beyond." She explained that, at a previous point in the case, C.E. had been hospitalized with meningitis for approximately three weeks. During the hospitalization, his foster parents stayed by his side day and night, in shifts, despite having to drive back and forth to Memphis. She described the foster parents as very attentive to C.E.'s medical needs and reliable with transportation for C.E., rarely asking for assistance from DHS. Williams testified that, after being in the foster home for over a year, C.E. had made substantial progress, was developing normally, and was a normal and happy one-year-old child.

Kimberly Wilson, a foster-care supervisor, stated that KayAnn's visitation had to be scheduled at a time when a supervisor could be present because there had been numerous incidents in which DHS workers had been unable to calm KayAnn during visitations. Wilson testified that she had witnessed KayAnn and Ray argue and that KayAnn had accused Ray of physical abuse. Wilson stated that because there was an approved home study on Josh Ellis and his wife in Germany, DHS's position was that the court should consider placing C.E. with his uncle. She stated that both the foster parents and the family in Germany wished to adopt C.E., and that adoption was preferable to permanent custody due to C.E.'s age. She also stated that Ray and KayAnn wanted C.E. to be placed with Josh because there was a lot of animosity

between the biological parents and the foster parents. She testified that Josh and Tamara Ellis were complete strangers to C.E. and that there was no good way to transition a child to a new home in another country. She said her suggestion would be for the relatives to come stay in Arkansas for a few weeks to allow C.E. to become familiar with them before moving to Germany. Wilson clarified that she had no concerns about how C.E. was being raised in the foster home and there was nothing to make her think that he needed a different placement. She acknowledged that he had bonded to his siblings here in Arkansas. She also noted how unusual and difficult it had been to obtain a home study in another country. She stated that DHS was not recommending placement with the family in Germany for any reason other than the fact that they are biological relatives to C.E. Wilson said that it could also be in C.E.'s best interest to stay with his foster family and remain in contact with his siblings. Wilson stated that she did not know Ray's brother and could not make a recommendation on whether placement with him would be in C.E.'s best interest.

Ray testified that he had paid child support throughout the case, had been seeing a therapist, and had attended visitation with C.E. Ray stated that if he could not have custody of C.E., he wanted the child to be placed with his brother in Germany. He stated that his brother wanted the child, could be in Jonesboro to pick him up in a few days, and that it was "all set up."

Ray admitted being argumentative and combative in his drug-and-alcohol assessment. Ray testified that DHS repeatedly changed its complaints against his family because it wanted to keep his children. In 2013, Ray was arrested for endangering the welfare of a minor but testified that he was charged only because the police department was "greedy" and wanted the

money from his fine. He acknowledged that he had posted tirades on social media accusing DHS and the attorney ad litem of lying to the court, falsifying reports, "doing a happy dance" when they were able to take someone's child away, and "stealing babies from people for no reason." He claimed that the attorney ad litem was "making money under the table to adopt the children she steals," was "evil," and was going to hell. He maintained those arguments in court.

The attorney ad litem recommended that C.E. remain in his current foster home. She noted that Ray had attended only nine visits during the year. In Ray's household with KayAnn, there was significant instability, drug use, arguing, and serious concerns about physical abuse. She noted that there were two families that wished to adopt C.E.: one in Germany that was biologically related to C.E. that he had never met, and the foster family in Jonesboro with which he was strongly bonded. She stressed that the focus must always be what is best for the child.

The attorney ad litem noted that the biological parents harbored significant animosity toward DHS and had accused DHS workers and attorneys of lying and wrongdoing. She stated that there had been "a lot of threatening behavior" from Ray, that the court previously had to issue a no-contact order against Ray for the foster parents, and that, given Ray's rant against her in court, she felt that she also needed a no-contact order against him. She recommended changing the case goal to termination and adoption but recommended that the question of which family should be allowed to adopt C.E. should be addressed after termination. She requested that there be no change in C.E.'s placement until that time.

Ray's attorney argued that C.E. was taken into DHS custody due to KayAnn's actions, which were no fault of Ray's. He acknowledged that C.E. could not be placed with Ray at that time because Ray lived with KayAnn, they were not in a stable relationship, and Ray's job as a truck driver often kept him away from home. He argued that if Ray could not have custody of C.E., the child should be placed with Ray's brother in Germany on a temporary basis. He argued that the law required the court to give preference to relative placement.

The court found that KayAnn was not credible and that Ray's denials of physical abuse were not credible. The court ordered that C.E. was to remain in his foster home. The court changed C.E.'s case goal to adoption. The court ordered continued, regular, and frequent visitation between C.E. and his siblings. The court granted the foster parents' motion to intervene. The court also ordered that there were to be no additional reunification services to KayAnn and Ray and that visitation with the biological parents was to cease.[4] The court issued a 54(b) certificate, and Ray filed a timely notice of appeal.

On appeal, Ray and DHS jointly argue that the circuit court clearly erred in denying DHS's recommendation that C.E. be placed with a biological relative who had an approved home study and that the court erred in changing the permanency goal to adoption. C.E.'s attorney has filed a brief urging us to affirm the circuit court's decision.

II. *Standard of Review*

In *Gyalog v. Arkansas Department of Human Servs.*, 2015 Ark. App. 302, at 6, 461 S.W.3d 734, 738, we explained,

---

[4] On Ray's motion for reconsideration, the court reinstated reunification services to Ray, except for visitation, which it reserved for the next hearing.

We review findings in dependency-neglect proceedings de novo, but we will not reverse the trial court's findings unless they are clearly erroneous. *Contreras v. Ark. Dep't of Human Servs.*, 2014 Ark. 51, at 5–6, 431 S.W.3d 297, 300 (citing *Lamontagne v. Ark. Dep't of Human Servs.*, 2010 Ark. 190, 366 S.W.3d 351). A finding is clearly erroneous when, although there is evidence to support it, the reviewing court, based on the entire evidence, is left with a definite and firm conviction that a mistake has been committed. *Id.* at 5–6, 431 S.W.3d at 300. Furthermore, this court defers to the trial court's evaluation of the credibility of witnesses. *Id.*, 431 S.W.3d at 300.

### III. *Analysis*

#### A. Applicability of the Juvenile Code's Relative-Placement Preference to Permanency-Planning Orders

Ray's first argument on appeal is that the trial court erred by not placing C.E. with a fit and willing relative. He argues that the purpose of the Juvenile Code is to strengthen and preserve family bonds, citing Arkansas Code Annotated section 9-27-302 (Repl. 2015). He argues that the code generally requires that a biological relative of a child placed in custody of DHS "shall be given preferential consideration for placement if the relative caregiver meets all relevant child protection standards and it is in the best interest of the juvenile to be placed with the relative caregiver." Ark. Code Ann. § 9-27-355(b)(1) (Repl. 2015). He also relies on section 9-28-105, which requires that "in all custodial placements," a relative shall be given preferential consideration. Based on these statutes, he argues that the Juvenile Code has a general preference for placement of a child with a fit and willing relative.

Importantly, Ray acknowledges that our previous cases have held that preferential consideration for relatives applies only to the initial placement of a child. *See Davis v. Ark. Dep't of Human Servs.*, 2010 Ark App. 469, 375 S.W.3d 721; *Henderson v. Ark. Dep't of Human Servs.*, 2010 Ark. App. 430. Ray argues that *Davis* and *Henderson* were incorrectly decided and should be overruled. In several recent cases, we have been asked to reconsider *Davis* and *Henderson*

and have declined to do so. *Donley v. Ark. Dep't of Human Servs.*, 2014 Ark. App. 335, at 4; *Ogden v. Ark. Dep't of Human Servs.*, 2012 Ark. App. 577, 424 S.W.3d 318; *Lovell v. Ark. Dep't of Human Servs.*, 2012 Ark. App. 547, at 4 ("We have rejected this very argument and decline appellant's invitation to revisit and overrule those decisions.").

Ray argues that the cases cited above are distinguishable because he is appealing a permanency-planning order and the previous cases dealt specifically with appeals from orders terminating parental rights. He notes that those cases hinged on the fact that the termination statute, Arkansas Code Annotated section 9-27-341, does not contain any provision creating a preference for placement of the child with a relative. *See Ogden*, 2012 Ark. App. 577, at 2. He argues that while our precedents hold that preferential consideration for placement with a relative applies only to the *initial placement*, it should also apply at the permanency-planning stage.[5] Therefore, if we decline to overrule *Davis* and *Henderson*, Ray urges us to limit their holdings to appeals from termination orders and rule that the relative-placement preference applies in all prior proceedings.[6]

We decline to limit *Henderson* and *Davis* by extending the relative-placement preference to the permanency-planning stage of dependency-neglect cases because Arkansas Code

---

[5] At oral argument, Ray's attorney elaborated on this argument. She explained that, because children almost always come into DHS custody unexpectedly and must be placed with a caregiver very quickly, there is not enough time for an interested relative to obtain a home study and be approved by DHS before the child is initially placed in a foster home. She argues that limiting the relative-placement preference to the initial placement of the juvenile effectively renders the preference meaningless.

[6] DHS argues that *Davis* and *Henderson* correctly held that the relative-placement preference is inapplicable to termination proceedings. Unlike Ray, DHS does not ask us to overturn our rulings in those cases. However, it joins Ray's argument that the relative-placement preference applies to permanency planning and that our precedents should be limited to apply only to appeals from termination orders.

SLIP OPINION

Annotated section 9-27-338 is controlling on this issue and establishes a clear set of priorities and preferences specifically for permanency-planning orders. Arkansas Code Annotated section 9-27-338(c) states that the potential permanency goals are listed "in order of preference." It then states that the circuit court must select a permanency goal based on the best interest, health, and safety of the juvenile. Section 9-27-338(c)(6) lists placement of the child with a fit and willing relative as the sixth most-preferred permanency goal, while termination and adoption are fourth on the list.[7] Ark. Code Ann. § 9-27-338(c)(4). Therefore, because section 9-27-338 specifically prioritizes placement of the child with a relative below five other potential permanency goals, including termination and adoption, it is incompatible with the general preference for relative placement contained in sections 9-27-302, 9-27-355, and 9-28-105. *See also Gyalog*, 2015 Ark. App. 302, at 8, 461 S.W.3d at 739 ("The statute lists termination and adoption as a preference above permanent custodial placement with a relative, which is in keeping with the overall goal of permanency for the juvenile.").

The Arkansas Supreme Court has often noted that "[i]t has long been the law in Arkansas that a general statute must yield when there is a specific statute involving the particular subject matter." *R.N. v. J.M.*, 347 Ark. 203, 212, 61 S.W.3d 149, 154 (2001); *Shelton v. Fiser*, 340 Ark. 89, 94, 8 S.W.3d 557, 560 (2000); *see also Bd. of Tr. v. Stodola*, 328 Ark. 194, 942 S.W.2d 255 (1997); *Donoho v. Donoho*, 318 Ark. 637, 887 S.W.2d 290 (1994); *Conway Corp. v. Constr. Eng'rs, Inc.*, 300 Ark. 225, 782 S.W.2d 36 (1989). However, statutes relating to the same

---

[7] We note that the statute contains exceptions to the applicability of the termination and adoption permanency goal, including the situation in which the child is currently "being cared for by a relative," the court finds that the relative has made a long-term commitment to the child, the relative is willing to pursue guardianship or permanent custody, and termination of parental rights is not in the best interest of the juvenile.

subject are said to be *in pari materia* and should be read in a harmonious manner, if possible. *Id.* at 212, 61 S.W.3d at 154 (citing *Minn. Mining & Mfg. v. Baker*, 337 Ark. 94, 989 S.W.2d 151 (1999)). According to these principles, we hold that sections 9-27-302, 9-27-355, and 9-28-105 indicate a general preference for relative placement, but that at the permanency-planning stage the general preference must give way to the specific provisions of section 9-27-338(c). This understanding of the general relative-placement preference is in keeping with the *Davis* and *Henderson* holdings that the preference applies only to the initial placement of the juvenile.[8] Therefore, at the permanency-planning stage of a dependency-neglect case, the circuit court must apply section 9-27-338(c) as it is written. We reject Ray's argument that the circuit court erred in failing to apply a general relative-placement preference in its decision not to place C.E. with Josh, as no such preference was applicable at this stage in the case.

## B. C.E.'s Best Interest

We also note that, even if the general relative-placement preference were applicable at the permanency-planning stage, we would affirm the circuit court's decision based on the best interest of the child. The various statutes at issue in this case, sections 9-27-302, 9-27-355, 9-28-105, and 9-27-338, all have one thing in common: placement with a relative is given preference only if it is in the best interest of the child. Arkansas Code Annotated section 9-27-302 lays out the purposes and goals of the Juvenile Code, one of which is to "preserve and strengthen the juvenile's family ties *when it is in the best interest of the juvenile.*" Ark. Code Ann. § 9-27-302(2)(A) (emphasis added). Arkansas Code Annotated section 9-27-355(b)(1) requires

---

[8] This holding is also consistent with section 9-27-338(c)(4)'s exception for situations in which the child is already being cared for by a relative, which demonstrates the legislature's emphasis on relative placement at the earliest stages of a dependency-neglect case.

that a biological relative of a child placed in custody of DHS "shall be given preferential consideration for placement if the relative caregiver meets all relevant child protection standards *and it is in the best interest of the juvenile to be placed with the relative caregiver.*" (Emphasis added.) Section 9-28-105 also requires that

> [i]n all custodial placements by the Department of Human Services in foster care or adoption, preferential consideration shall be given to an adult relative over a nonrelated caregiver, if: (1) The relative caregiver meets all relevant child protection standards; and (2) *It is in the best interest of the child to be placed with the relative caregiver.*

(Emphasis added.) Arkansas Code Annotated section 9-27-338 requires the court to make best-interest determinations when selecting a permanency goal. Furthermore, it is axiomatic that the child's best interest must be the paramount consideration in every decision the court makes at all stages of juvenile court proceedings. Ark. Code Ann. § 9-27-102.

In this case, the circuit court declined to place C.E. with Josh, ordered that C.E. remain in his current foster placement, ordered that visitation with his biological parents cease, and ordered that he continue to have regular visitation with his siblings. The court's order specifically stated that it reached these decisions "noting the best interests, welfare, health, and safety, and appropriate statutory placement alternatives." We hold that this ruling was not clearly erroneous based on the evidence before the circuit court. The *only* evidence introduced concerning Josh Ellis was a home study prepared by the military. Josh did not testify, either in person, by video, or telephonically, nor were any statements, depositions, or affidavits from Josh introduced. No one with personal knowledge about Josh, his family, or his home testified. Moreover, the evidence showed that Josh Ellis was a complete stranger to C.E., having never

14

met the child. Additionally, his location in Germany[9] would make it difficult, if not impossible, for DHS to continue to monitor C.E.'s well-being and assess the need for further services such as physical therapy.[10] Conversely, there was ample evidence to support the finding that remaining in his current foster placement was in C.E.'s best interest because he was thriving, his needs were being fully met, and he had weekly visitation with his siblings.[11]

When asked at oral argument to summarize the evidence favoring placement of C.E. with Josh in Germany, Ray's attorney provided only one response: that because Ray had never been found "unfit," his determination as to which placement was in C.E.'s best interest should have been controlling. Ray cites *Tuck v. Arkansas Department of Human Services*, 103 Ark. App. 263, 266, 288 S.W.3d 665, 668 (2008), for the proposition that he has a fundamental liberty interest in the care and control of his child. However, his reliance on *Tuck* is misplaced. *Tuck*'s discussion of a parent's fundamental rights relates to the procedures necessary to satisfy due process when a court terminates those rights. Ray has not cited any authority, nor are we aware of any, to support his argument that in the course of a dependency-neglect case in which the child remains in the care and custody of DHS, a parent retains the fundamental right to determine the child's best interest. The fact that Ray had never been found "unfit" is irrelevant;

---

[9] DHS has urged us not to "penalize" Josh for his service in the military. We note with disapproval that many of the parties' arguments on appeal focus on the interests of the adults in this case: Ray, KayAnn, Josh, and the foster parents. C.E.'s best interest must be the controlling factor in determining his placement, and we do not condone arguments that seek to influence his placement based on "rewarding" or "penalizing" the various adults in this case.

[10] Because this was permanency planning, not a final adoption, C.E. would remain in DHS custody and DHS would remain responsible for monitoring him and providing services.

[11] Sibling visitation also helps achieve the Juvenile Code's goal of preserving and strengthening family bonds.

SLIP OPINION

C.E. had been adjudicated dependent-neglected. An adjudication of dependency-neglect occurs without reference to which parent committed the acts or omissions leading to the adjudication; the juvenile is simply dependent-neglected. *See Howell v. Ark. Dep't of Human Servs.*, 2009 Ark. App. 612; *Albright v. Ark. Dep't of Human Servs.*, 97 Ark. App. 277, 248 S.W.3d 498 (2007). Because C.E. was a dependent-neglected juvenile, the circuit court, pursuant to section 9-27-338, was tasked with determining C.E.'s best interest and establishing a permanency goal for him. Ray has never parented C.E., and he was not legally entitled to be the final arbiter of C.E.'s best interest.

Absent Ray's opinion that placement with Josh was in C.E.'s best interest, there was no other evidence to support such a finding. There was significant evidence to support the finding that it was in C.E.'s best interest to remain in his current placement. We therefore affirm the circuit court's denial of Ray's request that C.E. be placed with Josh based on a finding that such placement would not have been in C.E.'s best interest.

C. Whether the Circuit Court Erred in
Changing the Case Goal to Termination and Adoption

Ray's second point on appeal is that the circuit court erred in changing the case goal to termination of parental rights and adoption. As we have discussed above, Arkansas Code Annotated section 9-27-338(c) lists available case goals "in order of preference" and states that the choice of a permanency goal must be made "in accordance with the best interest, health, and safety of the juvenile . . . ." Ark. Code Ann. § 9-27-338(c). Ray argues that placement of C.E. with Josh should have been prioritized over adoption because it would fall under the third permanency goal listed in the statute: "a plan to place custody of the juvenile with a parent or custodian . . . ." Ark. Code Ann. § 9-27-338(c)(3).

16

Ray's argument is misplaced. First, we note that a competing subsection of the statute specifically addresses the exact goal Ray was seeking (placement of the child in the permanent custody of a fit and willing relative) and prioritizes it below adoption and termination. *Gyalog*, 2015 Ark. App. 302, at 8, 461 S.W.3d at 739; Ark. Code Ann. § 9-27-338(c)(6). Moreover, the subsection Ray cites is inapplicable in this case because, as a prerequisite, the court must first find that the parent, guardian, or custodian is compliant with the case plan and has made significant, measurable progress toward remedying the circumstances that caused the child to be removed from the home. Ark. Code Ann. § 9-27-338(c)(3). No such findings were made in this case. Although Ray argues on appeal that he was in compliance with the case plan and that the only barrier to his ability to regain custody of C.E. was his work schedule, the evidence presented at trial indicates that Ray had failed to complete several provisions of the case plan, such as psychological counseling and parenting classes; was argumentative and combative with service providers; had rarely visited C.E.; and was found to have physically abused KayAnn.[12] The court did not find that Ray was in compliance and had made significant progress, and we cannot say that failure to make such findings was clear error. Therefore, section 9-27-338(c)'s third preference, placement with a guardian or custodian, was unavailable, and the court correctly applied the next available permanency goal, which was termination of parental rights and adoption.

As we have noted above, the subsection addressing termination and adoption, section 9-27-338(c)(4), contains an exception if (1) the child is "being cared for by a relative," (2) the court finds that the relative has made a long-term commitment to the child, (3) the relative is

---

[12] The court specifically found that Ray's denials of physical abuse were not credible.

willing to pursue guardianship or permanent custody, and (4) termination of parental rights is not in the best interest of the juvenile. This exception is not applicable because C.E. was not being cared for by a relative at the time of the hearing.

Moreover, the plain language of section 9-27-338(c) requires that the circuit court select a permanency goal based on the best interest of the child, and the exception found in section 9-27-338(c)(4) contains a best-interest element. We do not believe the circuit court clearly erred in finding that placement with Josh was not in C.E.'s best interest. As such, we affirm the circuit court's order setting termination of parental rights and adoption as the case goal.

Affirmed.

ABRAMSON, GLOVER, HIXSON, and HOOFMAN, JJ., agree.

VIRDEN, J., dissents.

**BART F. VIRDEN, Judge, dissenting.** I respectfully dissent. The legislature has determined public policy for the State of Arkansas to be in favor of placing dependent-neglected juveniles with a relative, if possible, as opposed to placing the juvenile in a state-funded foster home.

Arkansas Code Annotated section 9-27-355 (b)(1) sets forth:

A relative of a juvenile placed in the custody of the Department of Human Services shall be given preferential consideration for placement if the relative caregiver meets all relevant child protection standards and it is in the best interest of the juvenile to be placed with the relative caregiver.

Additionally, Arkansas Code Annotated section 9-28-105 sets forth a preference for family placement:

In all custodial placements by the Department of Human Services in foster care or adoption, preferential consideration shall be given to an adult relative over a non-related caregiver, if:

(1)  The relative caregiver meets all relevant child protection standards; and

(2)   It is in the best interest of the child to be placed with the relative caregiver.

Furthermore, Arkansas Code Annotated sections 9-27-315, 9-27-334(a)(2)(A) and 9-27-338(c)(3)(A), all allow for relative placement of the juvenile at various stages of the dependency-neglect proceedings.

In the present case, the Department caseworker testified about her opinion that family placement was in C.E.'s best interest:

> I think C.E. needs to go to Germany because the issues that exist within the home [still] exist. And he has a relative who has wanted this infant since, for a very long time they've been petitioning to get this infant. And so when we have a relative who is appropriate, we place children with relatives who are appropriate to keep them in the family. It also has to be, and in the best interest of the juvenile.

The caseworker also stated: "This is what we look at for all children in foster care to make sure that we protect them. Make sure that they get good homes and when at all possible, place them . . . with relatives. That is what we do every day."

Here, the trial court gave no consideration to the available relative placement available other than to deny it without discussion. Instead, the court chose to continue custody with the foster family who were allowed to intervene and become parties to the case. The relative offering to take custody of C.E. was serving in the armed forces and was living with his wife and child while stationed in Germany. The home study was admitted into evidence and became part of the record. The home study was approved, and he and his wife expressed a desire to care for his nephew.  Despite the majority's claim otherwise, there was ample evidence of the appropriateness of relative's home. Both the Department and Ray requested

the placement with Ray's brother, Josh, and his family in Germany. Ray's parental rights had not been terminated and he was never found to be an unfit parent.

While it is true that Josh and his family had never met C.E., it must be remembered that C.E. was taken into state custody at birth and placed with a foster family who had never "met" him either. To say C.E. had "bonded" with the foster family seeking to adopt him, is of no significance. One would be astounded to find that a newborn had not "bonded" with a family who had cared for him since his birth. The foster parents are to be commended for their willingness to provide a safe and loving home for unfortunate children like C.E.; however, according to Department regulations, a foster home should be temporary, and not an avenue for adoption.

> The foster care supervisor for the Department testified as follows:
>
> When these cases are opened, foster parents are given a handbook. . . . They signed something stating that they understand this is temporary placement for the child, and this is typically explained at the beginning of the placement. It's Department policy that whenever there's a relative to care for the child the Department will make that placement if it's in the child's best interest. There's no information that I have saying that the placement in Germany's not in this child's best interest.

The majority bases its affirmance on the trial court's statement that it was in the best interest of C.E. that he remain in the Department's custody, but that the Department could not change his placement. The majority is eminently correct in stating that the overriding polestar in these cases is the best interest of the child. However, if we simply look for those magic words, stated in a conclusory and perfunctory manner, as was the case here, there is no point in our appellate review. It may very well have been in C.E.'s best interest to remain with his foster family, but the trial court failed to explain why that was a better option than the approved and available relative placement that is the stated public policy as enacted by our

legislature. In *Mahone v. Arkansas Department of Human Services*, 2011 Ark. 370, at 5, 383 S.W.3d 854, 857, our supreme court dealt with a similar situation, and in that case it held

> Further, we are not convinced that, when conducting the best-interest analysis, the circuit court applied the statutory preference afforded to parents. As such, we cannot be assured that if it had applied that preference, the circuit court would have ruled the way it did. Accordingly, we reverse and remand to the circuit court.

(Citations omitted.) I would follow *Mahone*, and I would remand the case for the trial court to enter a decision giving appropriate weight to the relative placement preference.

*Tabitha McNulty*, Arkansas Public Defender Commission, Dependency-Neglect Appellate Division, for appellant.

*Jerald A. Sharum*, Office of Chief Counsel, for appellee.

*Chrestman Group, PLLC*, by: *Keith L. Chrestman*, attorney ad litem for minor child.